FILED
JUL 21 2005
LEONARD GREEN, Clerk

NOT RECOMMENDED FOR PUBLICATION

NO. 03-4173

INFORMATION COPY
MANDATE NOT YET ISSUED
DIS. CT. # 01-888

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

C-1-01-888

WILLIAM H. PARRIES, II,

Plaintiff-Appellant,

v.

MAKINO, INC.,

Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

BEFORE: DAUGHTREY and SUTTON, Circuit Judges, and FORESTER,* District Judge.

**MARTHA CRAIG DAUGHTREY, Circuit Judge.** The plaintiff, William Parries, appeals from the district court's order granting summary judgment to his former employer, Makino, Inc., in an action Parries filed charging violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e et seq., and intentional infliction of emotional distress under Ohio state law. Parries was initially terminated in November 1999 but was reinstated by order of an arbitrator in August 2000. In June 2001, he was terminated a second time. In his complaint, Parries alleged that both actions were based on race discrimination and that the employer had illegally retaliated against him for filing a discrimination charge with the Ohio

*The Hon. Karl S. Forester, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Civil Rights Commission after his termination in 1999. The district court granted summary judgment to Makino on all counts, finding that the plaintiff had not made out a prima facie case of either discrimination or retaliation. On appeal, we conclude that the district court correctly determined that the discrimination claim failed for lack of a prima facie case. But, contrary to the district court's determination, we also conclude that the plaintiff did succeed in establishing a prima facie case of retaliation. What the plaintiff failed to do, however, was to rebut the defendant's legitimate business reason for his termination and, as a result, we hold that summary judgment was appropriately entered in the defendant's favor.

**FACTUAL AND PROCEDURAL BACKGROUND**

Parries began working for Makino, Inc., in 1990 and was employed there continuously until his first termination in November 1999. He was one of very few African-American employees among the union workforce at Makino. Parries believed that he had experienced disparate treatment based on his minority status almost from the beginning of his employment at Makino and, as a result, he filed his first complaint with the Ohio Civil Rights Commission in March 1990 and lodged several more in the following years. This case, however, deals solely with events leading to his terminations in 1999 and 2001, and the only protected activity alleged as a basis for his retaliation claim is the charge he filed with the Ohio Commission following his 1999 termination.

The facts in the record establish that in early 1998, Makino promoted Parries to the position of electrical technician, which placed him under the direct supervision of Don Hoerlein and Jeff Reichert. In September 1998, a different supervisor observed Parries

returning late from lunch break. That supervisor, Sisson, gave Parries a verbal warning and placed a note in Parries's file. Makino used a system of "progressive discipline" under which an employee goes though three steps of discipline levels before being subject to discharge. However, the note that Sisson wrote did not count as a formal discipline step, and Parries was not aware of its existence. In November 1998, Reichert did place Parries on the first level of discipline after observing him returning late from lunch. Parries said that he had been talking with two other employees about a company meeting he attended earlier in the day. In March 1999, Parries was placed on the second step of discipline when he returned late from break time. Parries's explanation was that he was a candidate for a union leadership position and had been discussing contract issues with a fellow union member.

A few days later, Parries missed work without informing his supervisor in advance. Under Makino's point-based attendance policy, an employee earned credit points for good attendance and penalty points for any absences. Credits could be applied against absences, but only if the employee called in within the first two hours of an absence. Parries's absence placed him over the ten-point limit and thus subjected him to discipline. Because Parries had forgotten to call in the morning of his absence, Hoerlein refused Parries's post hoc request to apply his credit points. Hoerlein placed Parries on the third disciplinary level for this infraction.

In October 1999, Parries was recorded as having committed three disciplinary infractions that were not individually punished but that led up to a "last chance agreement." Specifically, on October 12, a Makino supervisor observed Parries clocking into work and

then returning to his car, parking, and re-entering the facility. The supervisor reported the incident to Reichert, who gave Parries a verbal warning. Two days later, on October 14, Parries returned five minutes late from break after spending the time discussing safety issues with other union members. The next day, on October 15, Parries remained away from his workstation for longer than permitted for a discussion with the union president, who was a fellow employee. In response to these three incidents, Makino management met with Parries and issued the "last chance agreement." The agreement was in lieu, they said, of the usual fourth step of discipline, which was permanent termination. The agreement provided that "[a]ny violation of this 'Last Chance Agreement' will result in disciplinary action, up to and including termination." Parries declined to sign the document.

Invoking the terms of the "last chance agreement," Makino terminated Parries a month later, in November 1999. Earlier that month, Parries had lost his employee badge and could not clock in and out of work in the usual fashion. Parries called his supervisor on the phone to check in verbally for the first two days, but there is a dispute as to whether he did so for the following three days. Although Parries maintained that he saw Reichert on the floor and asked him to check him in, Reichert had no record of this. Reichert concluded that Parries had violated the "last chance agreement" and contacted the manager of labor relations at Makino, who decided to discharge Parries. In response, Parries filed a claim of race discrimination and retaliation with the Ohio Civil Rights Commission, which found that "probable cause d[id] exist" to credit Parries's allegations of discrimination.

Parries also challenged his termination in arbitration, and he won. The arbitrator concluded that Parries had not violated the "last chance agreement" and ordered reinstatement with back pay, which occurred on August 8, 2000. His new position was as a unit assembler under the supervision of Hoerlein. Once again, Parries immediately began to have run-ins with his supervisors. Twice in August, Hoerlein spoke to Parries about making "loud noises" while at his work station. In November 2000, Hoerlein gave Parries a five-day suspension after finding him away from his work-station without permission. Makino later rescinded the suspension and instead gave Parries a "final warning." In response to this incident, Parries filed a retaliation claim with the Ohio Civil Rights Commission. In December 2000, Parries again faced discipline, this time for attempting to tape-record a meeting between the union and Makino management. Although Parries claimed that the anti-recording policy was never made explicit, the company insisted that he had been told in a previous meeting that he was not allowed to make such tape-recordings. In January 2001, Parries received a "final warning" from Ed Morris, the supervisor under whom he was then working, for improperly recording his hours. Parries then filed yet another complaint with the Ohio Civil Rights Commission. In March, Morris gave Parries two verbal and one written warning for his poor work performance.

The situation came to a head in June 2001 when Parries entered into an argument with Morris and Hoerlein about whether Hoerlein had given employees certain information about their overtime hours. In the course of the argument, Parries called Hoerlein a liar

and told him to "get some balls." Makino then terminated Parries's employment, citing his poor performance, repeated disciplinary problems, and insubordination.

## DISCUSSION

### A. The Discrimination Claims

"[A] plaintiff may establish a prima facie case of discrimination either by presenting direct evidence of intentional discrimination by the defendant or by showing the existence of facts which create an inference of discrimination." *Talley v. Bravo Pitino Rest.*, 61 F.3d 1241, 1248 (6th Cir. 1995) (citations omitted). Although Parries attempted, unsuccessfully, to produce direct evidence of discrimination in regard to the defendant's actions, the bulk of the evidence in this case was aimed at "creat[ing] an inference of discrimination." To show an inference of discrimination, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), mandate a showing that the plaintiff (1) was a member of a protected class; (2) was discharged; (3) was qualified for the position; and (4) was replaced by a person outside the class. There is no dispute in this case that Parries established the first three *McDonnell Douglas* factors for both his 1999 and 2001 terminations. The district court found, however, that Parries had not established that he had been replaced by a non-minority worker in both instances and had therefore failed to make out a circumstantial case of discrimination.

Following Parries's dismissal in 1999, Makino filled his position with outside contractors. The record contains no information about their ethnicity or race because Parries failed to produce any such evidence. Hence, Parries has not shown he was replaced with a non-minority person, the fourth *McDonnell Douglas* element. Makino maintains that Parries was not replaced at all, but rather that his position was eliminated.

Nevertheless, instead of showing the fourth *McDonnell Douglas* element, a plaintiff may make out a prima facie case by showing "that a comparable non-protected person was treated better." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992). To establish disparate treatment, the plaintiff must show that he was similarly-situated in all relevant aspects to the comparable worker. *See Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994). In a discriminatory discipline or firing context, "similarly-situated" means that "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583. Although the comparison need not involve identical misconduct, the misconduct must be of comparable seriousness. *See Hollins v. Atl. Co., Inc.*, 188 F.3d 652, 659 (6th Cir. 1999).

Parries passed through four stages of disciplinary action prior to his 1999 termination. He now contends that a showing of disparate treatment in even one of the stages invalidates his final termination because the termination was built upon the

successive disciplinary measures. However, in reviewing the individual disciplinary actions and the evidence of comparables produced, we cannot say that any one of the employer's actions meets the *Mitchell* similarly-situated standard. Viewed as a whole, the record of discipline suggests that Parries, as one of the very few African-American employees, may have been subjected to more intense scrutiny by his employers than were other, non-minority workers, but the same evidence does not establish legally disparate treatment.

For example, the record shows that Parries was placed on the first level of discipline on November 17, 1998, for returning half-an-hour late from his lunch break. Parries contended that he was 15 minutes late because he started his lunch break late due to a company meeting that ran long. Then, on his way back from lunch, two other employees questioned him about the contents of the meeting. When Parries returned to his work station, supervisor Reichert confronted him about being late. Parries complained that he was written up but the two white employees with whom he had been conversing received no discipline. However, Parries did not show that he was similarly-situated to his two co-workers; he presented no evidence that Reichert was a supervisor of the two white men, that they were not on an approved break, that Reichert saw the other men away from their work stations, or even that they actually were away from their work stations while talking to Parries.

The second disciplinary action occurred on March 15, 1999, when Parries was written up for returning late from lunch after discussing union issues with co-workers as part of his campaign for a union leadership position. Parries claimed that it was common practice for union candidates to take a few minutes of work time to explain issues to their

co-workers. Parries submitted declarations from two co-workers alleging that they had each engaged in campaigning on company time and had not been punished for it. Again, however, Parries did not show that he was similarly-situated to those two co-workers because there was no indication of who the workers' supervisors were, whether the supervisors were aware of the practice, when the co-workers' campaigning occurred, or whether it was done in a similar manner. To make out a case of disparate treatment, the plaintiff must produce *specific facts* showing he and the non-minority employee engaged in similar conduct. *See Hardy v. Eastman Chem. Co.*, Docket No. 01-5361, 2002 WL 31553926 (6th Cir. Nov. 12, 2002). That requirement was not met in this instance.

Parries was placed on the third disciplinary level on March 22, 1999, after an unscheduled absence caused him to exceed his allowable "absentee points" and he failed to call in as required by company rules. As noted above, supervisor Hoerlein refused to allow Parries to apply his good points retroactively and suspended Parries for three days. In contrast, the plaintiff noted, a white co-worker, Brett Manning, similarly exceeded his permissible absentee points in 1998 without calling in, yet Hoerlein allowed him to apply his good points retroactively. According to Makino, the difference in treatment was due to the fact that at the time he was permitted to apply the offset, Manning had been an employee of Makino for only a few months and told supervisor Hoerlein that he had misunderstood the absentee policy. Apparently Hoerlein had then explained the policy to him and warned him not to engage in another infraction. By contrast, Parries had been a Makino employee for almost ten years and was fully familiar with the policy. Although the call is a close one, we cannot say that the district court erred in finding that Manning's

status as a recent employee unfamiliar with the protocol constituted "differentiating or mitigating circumstances that would distinguish [his] conduct or the employer's treatment of [him] for it." *Mitchell*, 964 F.2d at 583. Indeed, in 1999 Manning exceeded his allowable absentee points and was subjected to the usual discipline, a three-day suspension. Finally, we are not persuaded by the testimony of another white co-worker, Kincaid, who testified that some employees were allowed to apply good points to absences retrospectively, because Kincaid was unable to give any details as to when or to whom this happened or what supervisor was involved.

On October 18, 1999, Makino gave Parries a "last chance" warning as a result of three additional minor infractions. For each one of these infractions, Parries offered substantial evidence that a similarly-situated white employee was treated better. However, Parries was disciplined for the *combination* of the three, not each individual incident. Parries further argues that the so-called "last chance agreement" was itself evidence of disparate treatment because it was an unprecedented discipline step that was not countenanced or mentioned by the union contract. Not surprisingly, however, the district court found that the agreement actually *benefitted* Parries because it was in lieu of immediate termination and thus could not be used as evidence of negative disparate treatment. The existence of the "last chance" warning did not insulate Makino from arbitration; Parries requested arbitration after being fired under the "last chance agreement" and won. Notably, although Parries succeeded in his effort to attain reinstatement, the arbitrator's order included a statement to the effect that the arbitrator had given "no weight or substance to any claim of racial discrimination." This

determination squares with the district court's finding that the plaintiff failed to show disparate treatment in any of the disciplinary steps leading up to his 1999 termination and thus has not made out a prima facie case of racial discrimination with regard to that action by Makino.

We conclude that Parries likewise failed to make out a prima facie case for his 2001 termination under the four *McDonnell Douglas* elements. He undisputedly met the first three elements but, as with the 1999 claim, did not adequately demonstrate that he was replaced by a non-minority person. When Parries was fired in 2001, his duties were split between two existing workers, both white, who were on a lower union labor grade. Eight to ten months later, Makino promoted one of these employees, Greg Waites, to the higher labor grade position Parries had formerly occupied. "Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement" and, hence, the question is whether the delayed promotion of Waites constituted replacement. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1115 (6th Cir. 2001) (quoting *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992)). The record indicates that Waites took on many, but not all, of the plaintiff's duties without any initial change in position or employment status. That fact, together with the substantial delay in Waites's promotion, suggests that Waites was not promoted to "replace" Parries directly. We cannot say that the district court erred in concluding that the plaintiff has failed to demonstrate that promoting Waites after a long delay was tantamount to replacement.

As an alternative to the fourth *McDonnell Douglas* element, Parries attempted to show that the second termination resulted from disparate treatment. In June 2001, Parries

was fired after engaging in a heated discussion with supervisors Morris and Hoerlein and calling Hoerlein a liar who needed to "get some balls." Under the union collective bargaining agreement, Makino could terminate employees for offenses of "a serious nature," including insubordination, even if the employee has no prior disciplinary problems. Parries argued that the "get some balls" statement was common shop talk and did not merit termination, but he presented no evidence of fellow employees making similar comments to management.

Parries also argued that, even if the final termination incident showed no disparate treatment, Makino unfairly disciplined him in several incidents preceding his discharge. Unlike the situation leading up to his 1999 termination, Parries was not explicitly placed on escalating levels of discipline, but his disciplinary history clearly did play a role in Makino's decision to fire him in 2001. Even when these prior incidents are considered, however, they do not support an allegation of disparate treatment. In November 2000, supervisor Hoerlein suspended Parries for five days as a result of his being away from his workstation without permission. This suspension was subsequently rescinded and Parries was given back-pay, but he received a written final warning informing him that he was in violation of the "last chance agreement." Farmer, a white co-worker who was with Parries away from the workstations, was given only a documented verbal warning placing him on discipline level one. Farmer was not similarly situated, however, because Farmer did not have the history of disciplinary problems that Parries had and was not subject to a "last chance" warning. Hile, another white co-worker under Hoerlein's supervision, testified that he was out of his work area on the same day but was not disciplined. Hile claimed that someone,

he could not remember who, told him that Hoerlein had been looking for him and knew he was away from his work station. There is no non-hearsay evidence, however, that Hoerlein had knowledge of Hile's infraction and, thus, no proof that Hile was similarly situated to Parries.

In December 2000, Parries was suspended for three days after tape recording a meeting with management. Parries claimed his punishment was unduly harsh, but he provided no evidence of other similarly-situated employees being treated differently. In January 2001, Parries was disciplined more harshly than some white co-workers for improperly recording his hours but, again, failed to supply evidence that the co-workers were similarly-situated in terms of disciplinary history, supervisor, or severity of misconduct.

Even if Parries had made out a prima facie case for his two terminations, he did not provide sufficient evidence to show that Makino's reasons for the terminations were pretextual. "Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to rebut the presumption of discrimination by providing evidence showing that the plaintiff was terminated for a legitimate nondiscriminatory reason." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758-59 (6th Cir. 2000). Because Makino presented a race-neutral reason for firing Parries, i.e., his history of disciplinary problems, poor performance, and insubordination, Parries was required to "produce sufficient evidence from which the jury [could] reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). To make a showing of pretext, "the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not

*actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." *Id.* at 1084 (citations omitted). Parries did not challenged the factual accuracy of the disciplinary infractions and thus did not dispute pretext under the first manner of showing. In order to show pretext via the second method, "the plaintiff may not rely simply upon his prima facie evidence but must, instead, introduce additional evidence of . . . discrimination." *Id.* at 1084. However, the record does not reflect the production of admissible evidence above and beyond that required for a prima facie showing. The third manner of showing pretext "ordinarily consists of evidence that other employees . . . were not fired even though they engaged in substantially identical conduct." *Id.* Given that Parries could not demonstrate disparate treatment, he did not satisfy the third method because he failed to show that any other employee who engaged in the same pattern of infractions was not fired. *See Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 730-31 (6th Cir. 1999) (holding that an employee fired for a series of incidents alleged to constitute misconduct must show that a similarly-situated employee engaged in a comparably serious *series* of bad acts, not merely similar individual acts).

We conclude that Makino's motion for summary judgment was properly granted because Parries did not establish a prima facie case of discrimination based on circumstantial evidence, nor did he rebut as pretextual the employer's legitimate business reason for discharge.

**B. The District Court's Ruling on the Defendant's Motion to Strike**

In addition to attempting to demonstrate an inference of discrimination under the *McDonnell Douglas* and *Mitchell* standards, Parries also argued that there was direct evidence of racial animus underlying the 2001 termination. A plaintiff who can show direct evidence of discrimination need not show the four *McDonnell Douglas* elements or satisfy the *Mitchell* disparate treatment standard. *See Talley*, 61 F.3d at 1248. To meet his prima facie burden in this manner, however, the plaintiff must present "credible, direct evidence of discriminatory animus," and the lower court must then specifically make a finding that the plaintiff's evidence is credible. *See id.*

In an attempt to produce such evidence, Parries proffered an unsworn declaration by a former Makino employee, Brian Smith, who claimed to have heard supervisors Ed Morris and Patrick Ruggiero use the term "nigger" in reference to Parries while he was under their supervision. However, the Smith declaration fails to indicate when the statements were made and under what circumstances. Moreover, the document was filed after discovery was completed, and it was not covered by the description of Smith's expected testimony as summarized in the plaintiff's witness list, filed pursuant to Federal Rule of Civil Procedure 26.

In response, Makino filed a timely motion to strike Smith's declaration, pointing out that the plaintiff had "failed to properly disclose the subject matter of Mr. Smith's testimony in violation of his obligations under [Rule] 26 and this Court's Scheduling Order." The district court did not rule on the merits of this motion explicitly. However, in ruling on the summary judgment motions, the court announced that it was not relying on the Smith declaration. Under these circumstances, we interpret the district court's ruling as an

implicit grant of Makino's motion to strike, based on a determination that the declaration was not filed in a timely manner. While the better practice would have been to rule explicitly, we cannot say that the district court committed an abuse of discretion in this regard. *See Wimberly v. Clark Controller Co.*, 364 F.2d 225, 227 (6th Cir. 1966).

**C. The Retaliation Claim**

In addition to his discrimination claims, plaintiff brought a Title VII retaliation claim against defendant Makino. "To make a prima facie case of Title VII retaliation, a plaintiff must prove: (1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Ford v. Gen. Motors Co.*, 305 F.3d 545, 552-53 (6th Cir. 2002). Notably in this case, Sixth Circuit precedent provides that "[t]he burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Makino does not dispute that Parries has shown the first three elements of this test. Makino knew that Parries filed a claim of discrimination with the Ohio Civil Rights Commission in the wake of his 1999 termination, and Makino then terminated Parries's employment in June 2001. The question remaining is whether Parries has shown sufficient evidence to raise a genuine issue of material fact as to the causal connection between his filing of the civil rights claim with the Ohio commission and his discharge. To establish the causal connection required by the fourth prong, a plaintiff must "put forth some evidence

to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, provided it is credible." *Nguyen*, 229 F.3d at 566 (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)). In making this determination, the court must view the evidence in the light most favorable to the non-movant and must draw all reasonable inferences in the non-movant's favor. *See Ford*, 305 F.3d at 555.

The allegedly retaliatory behavior against Parries began almost immediately after his reinstatement at work in August 2000. The Sixth Circuit has found timing to be a relevant factor in a showing of causal connection. "Although 'temporal proximity alone will not support an inference in the face of compelling evidence' to the contrary, 'the proximity in time between protected activity and adverse employment action may give rise to an inference of a causal connection." *Ford*, 305 F.3d at 554-55 (quoting *Moon v. Transp. Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987)). The relevant measure of time is the period between the resumption of work after the protected activity and the termination. *See Ford*, 305 F.3d at 554-55. In *Harrison v. Metropolitan Government*, 80 F.3d 1107, 1119 (6th Cir. 1996), we held that a 15-month time gap was short enough to constitute "temporal proximity." Here, Parries was fired by Makino less than 11 months after resuming his employment. Further, Parries claimed that the first retaliatory behavior occurred on August 16, 2000, a mere eight days after he returned to work.

As the district court noted, however, in order to show causal connection, a plaintiff must demonstrate some evidence of retaliatory conduct *in addition to* temporal proximity. *See Nguyen*, 229 F.3d at 566. Although the district court found that there was no such

additional evidence in the record, our review suggests that the plaintiff may have been subjected to excessive scrutiny of his conduct and may have experienced "more frequent disciplinary writeups . . . for trivial matters" than other Makino employees, which we have held to constitute evidence of retaliatory conduct. *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999); *see also Harrison*, 80 F.3d at 1119 ("More important, however, is the fact that study of the record in this case reveals an atmosphere in which the plaintiff's activities were scrutinized more carefully than those of comparably situated employees. . ."). For example, in August 2000 supervisor Don Hoerlein twice "counseled" Parries for making loud or strange noises while working. Parries contends that Hoerlein's accusations were false, but even if true, the incident suggests that Parries was being disciplined for basically "trivial matters." In November of the same year, Hoerlein suspended Parries for five days for being away from his work station without permission. Makino later rescinded the suspension and granted him back pay, issuing Parries merely a "final warning" as his punishment.

We recognize that a jury could find that the close supervision Parries received after his earlier discharge was simply the result of his history of disciplinary problems leading up to the 1999 dismissal. On the other hand, he was reinstated following post-discharge arbitration, and a jury might find that the ensuing level of scrutiny leading up to the dismissal in 2001 was unjustified in terms of the relatively minor nature of the alleged misconduct it revealed.

Moreover, the plaintiff identified another factor that is pertinent to the determination of causal connection in the retaliation setting, and that is increased workload. *See Ford*,

305 F.3d at 555. Parries alleged that supervisor Ed Morris assigned him a disproportionately high number of the difficult jobs and that this overload in his assignments resulted in Parries's poor work performance. However, the only evidence to support this allegation came from the declaration of Brian Smith, which, as noted above, was not considered by the district court.

Finally, Parries presented evidence that Makino supervisors discouraged the filing of grievances and threatened to take retaliatory action against employees who filed them. In a memo written by Ed Morris requesting that Parries be removed from his supervision or fired, Morris cited Parries's history of filing grievances as problematic behavior. Similarly, supervisor Hoerlein warned white employee Farmer that the company would "take care of the problem" if Farmer continued to file grievances. Although all of Farmers's grievances and some of Parries's were not based on race and thus were not protected actions, Parries asserts that this shows a willingness on the part of Makino to punish employees for making grievances. Indeed, we have held that a supervisor's comments indicating an intent to run employees out of his department, combined with the fact that several employees feared retaliation if they testified at a hearing, sufficiently established a prima facie case of retaliation. *See Harrison*, 80 F.3d at 1119. While it appears that Parries's situation was not as compelling as the one in *Harrison*, we conclude that the two situations are similar enough that Hoerlein's threats could be considered evidence of retaliation.

A finding that the plaintiff has established a prima facie case of retaliation does not end our analysis, however. As with a claim of discrimination, the burden then shifts to the

defendant to "articulate a legitimate, non-discriminatory reason for the adverse action." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). Makino met this burden by establishing that Parries was terminated due to his history of disciplinary problems and his unacceptable insubordination to Hoerlein in June 2001. The burden thus shifted back to Parries, requiring him to demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for a retaliatory animus. *Ibid.* We have suggested that "caution should be exercised in granting summary judgment once a plaintiff has established a prima facie inference of retaliation," *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004), but we conclude that in this case, summary judgment was appropriate. We have already held in conjunction with the plaintiff's discrimination claims that there was insufficient evidence to establish pretext. Parries presented no additional evidence to indicate that the employer was engaging in pretext in terms of the retaliation claim. It follows that summary judgment was proper on the latter claim as well as the former.

## CONCLUSION

For the reasons set out above, we AFFIRM the judgment of the district court.